Dale HACKBART, Plaintiff,

v.

CINCINNATI BENGALS, INC. and Charles "Booby" Clark, Defendants.

Civ. A. No. 75 M 437.

United States District Court, D. Colorado.

Aug. 18, 1977.

Roger F. Johnson and Mary Butler, Johnson & Mahoney, P. C., Denver, Colo., for plaintiff.

William C. McClearn, Holland & Hart, Denver, Colo., Robert G. Stachler and Thomas T. Terp, Taft, Stettinius & Hollister, Cincinnati, Ohio, for defendants.

## FINDINGS, CONCLUSIONS AND ORDER

MATSCH, Judge.

Jurisdiction over this civil action is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332. By agreement of the parties, a separate trial to the court was held on the question of liability, with issues of damages and causation reserved. The case arises as a result of an incident which occurred in the course of a professional football game played between the Denver Broncos and the Cincinnati Bengals, in Denver, Colorado, on September 16, 1973.

### The Parties

The plaintiff, Dale Hackbart, is a citizen of Colorado who was a 35 year old contract player for the Denver Broncos Football Club in the National Football League at the time of the incident. He was then 6 feet 3 inches tall and weighed 210 pounds. Mr. Hackbart had 13 years' experience as a professional football player after competing in college and high school football, making a total of 21 years of experience in organized football.

The Denver game was the first regular season professional football game for the defendant, Charles Clark, who was then 23 years old with a weight of 240 pounds and a height of 6 feet 1¾ inches. Mr. Clark was a contract player for the Cincinnati Bengals Football Club, Inc., defendant herein, which was also a member of the National Football League. Both defendants are citizens of states other than Colorado.

### The Incident

The incident which gave rise to this lawsuit occurred near the end of the first half of the game at a time when the Denver team was leading by a score of 21 to 3. Dale Hackbart was playing a free safety position on the Broncos' defensive team and Charles Clark was playing fullback on the Bengals' offensive team. The Cincinnati team attempted a forward pass play during which Charles Clark ran into a corner of the north end zone as a prospective receiver. That took him into an area which was the defensive responsibility of Mr. Hackbart. The thrown pass was intercepted near the goal line by a Denver linebacker who then began to run the ball upfield. The interception reversed the offensive and defensive roles of the two teams. As a result of an attempt to block Charles Clark in the end zone, Dale Hackbart fell to the ground. He then turned and, with one knee on the ground and the other leg extended, watched the play continue upfield. Acting out of anger and frustration, but without a specific intent to injure, Charles Clark stepped forward and struck a blow with his right forearm to the back of the kneeling plaintiff's head with sufficient force to cause both players to fall forward to the ground. Both players arose and, without comment, went to their respective teams along the sidelines. They both returned to play during the second half of the game.

Because no official observed it, no foul was called on the disputed play and Dale Hackbart made no report of this incident to his coaches or to anyone else during the game. Mr. Hackbart experienced pain and soreness to the extent that he was unable to play golf as he had planned on the day after the game, he did not seek any medical attention and, although he continued to feel pain, he played on specialty team assign-

ments for the Denver Broncos in games against the Chicago Bears and the San Francisco Forty-Niners on successive Sundays. The Denver Broncos then released Mr. Hackbart on waivers and he was not claimed by any other team. After losing his employment, Mr. Hackbart sought medical assistance, at which time it was discovered that he had a neck injury. When that information was given to the Denver Broncos Football Club, Mr. Hackbart received his full payment for the 1973 season pursuant to an injury clause in his contract.

### The Professional Football Industry

The claim of the plaintiff in this case must be considered in the context of football as a commercial enterprise. The National Football League (NFL) is an organization formed for the purpose of promoting and fostering the business of its members, the owners of professional football "clubs" with franchises to operate in designated cities. The Denver Broncos Football Club is a trade name for Rocky Mountain Empire Sports, Inc., a Colorado corporation. The league has a constitution and bylaws which provide for substantial control of the franchisees by league officers and committees. All NFL players as employees of the member clubs are required to sign a standard form of player contract prescribed by the league.

The National Football League Players' Association is an unincorporated association which is the sole and exclusive bargaining representative of all professional football players in the NFL as a labor organization under the National Labor Relations Act. A collective bargaining contract between that association and the National Football League Player Relations Association, as bargaining agent for the member clubs, was in effect during 1973. The agreement includes adoption of the standard player contract form and covers other terms and conditions of employment, including an injury grievance procedure to resolve disputes between a player and his employer. There is no provision for disputes between players of different teams.

Football is a recognized game which is widely played as a sport. Commonly teams are organized by high schools and colleges and games are played according to rules provided by associations of such schools.

The basic design of the game is the same at the high school, college and professional levels. The differences are largely reflective of the fact that at each level the players have increased physical abilities, improved skills and differing motivations.

Football is a contest for territory. The objective of the offensive team is to move the ball through the defending team's area and across the vertical plane of the goal line. The defensive players seek to prevent that movement with their bodies. Each attempted movement involves collisions between the bodies of offensive and defensive players with considerable force and with differing areas of contact. The most obvious characteristic of the game is that all of the players engage in violent physical behavior.

The rules of play which govern the method and style by which the NFL teams compete include limitations on the manner in which players may strike or otherwise physically contact opposing players. During 1973, the rules were enforced by six officials on the playing field. The primary sanction for a violation was territorial with the amounts of yardage lost being dependent upon the particular infraction. Players were also subject to expulsion from the game and to monetary penalties imposed by the league commissioner.

The written rules are difficult to understand and, because of the speed and violence of the game, their application is often a matter of subjective evaluation of the circumstances. Officials differ with each other in their rulings. The players are not specifically instructed in the interpretation of the rules, and they acquire their working knowledge of them only from the actual experience of enforcement by the game officials during contests.

Many violations of the rules do occur during each game. Ordinarily each team

receives several yardage penalties, but many fouls go undetected or undeclared by the officials.

Disabling injuries are also common occurrences in each contest. Hospitalization and surgery are frequently required for repairs. Protective clothing is worn by all players, but it is often inadequate to prevent bodily damage. Professional football players are conditioned to "play with pain" and they are expected to perform even though they are hurt. The standard player contract imposes an obligation to play when the club physician determines that an injured player has the requisite physical ability.

The violence of professional football is carefully orchestrated. Both offensive and defensive players must be extremely aggressive in their actions and they must play with a reckless abandonment of self-protective instincts. The coaches make studied and deliberate efforts to build the emotional levels of their players to what some call a "controlled rage."

John Ralston, the 1973 Broncos coach, testified that the pre-game psychological preparation should be designed to generate an emotion equivalent to that which would be experienced by a father whose family had been endangered by another driver who had attempted to force the family car off the edge of a mountain road. The precise pitch of motivation for the players at the beginning of the game should be the feeling of that father when, after overtaking and stopping the offending vehicle, he is about to open the door to take revenge upon the person of the other driver.

The large and noisy crowds in attendance at the games contribute to the emotional levels of the players. Quick changes in the fortunes of the teams, the shock of violent collisions and the intensity of the competition make behavioral control extremely difficult, and it is not uncommon for players to "flare up" and begin fighting. The record made at this trial indicates that such incidents as that which gave rise to this action are not so unusual as to be unexpected in any NFL game.

The end product of all of the organization and effort involved in the professional football industry is an exhibition of highly developed individual skills in coordinated team competition for the benefit of large numbers of paying spectators, together with radio and television audiences. It is appropriate to infer that while some of those persons are attracted by the individual skills and precision performances of the teams, the appeal to others is the spectacle of savagery.

*Plaintiff's Theories of Liability*

This case is controlled by the law of Colorado. While a theory of intentional misconduct is barred by the applicable statute of limitations, the plaintiff contends that Charles Clark's foul was so far outside of the rules of play and accepted practices of professional football that it should be characterized as reckless misconduct within the principles of Section 500 of the *Restatement of Torts*, 2d. Those principles have been recognized in Colorado in *Fanstiel v. Wright,* 122 Colo. 451, 222 P.2d 1001 (1950) and *Coffman v. Godsoe,* 142 Colo. 575, 351 P.2d 808 (1960). A reckless disregard for the safety of a goalkeeper in a schoolboy soccer game was the basis for recovery in *Nabozny v. Barnhill,* 31 Ill.App.3d 212, 334 N.E.2d 258 (1975).

Alternatively, the plaintiff claims that his injury was at least the result of a negligent act by the defendant. The difference in these contentions is but a difference in degree. Both theories are dependent upon a definition of a duty to the plaintiff and an objective standard of conduct based upon the hypothetical reasonably prudent person. Thus, the question is what would a reasonably prudent professional football player be expected to do under the circumstances confronting Charles Clark in this incident?

Two coaches testified at the trial of this case. Paul Brown has had 40 years of experience at all levels of organized football, with 20 years of coaching professional football. Both Mr. Brown and Mr. Ralston emphasized that the coaching and instructing of professional football players did not

include any training with respect to a responsibility or even any regard for the safety of opposing players. They both said that aggressiveness was the primary attribute which they sought in the selection of players. Both emphasized the importance of emotional preparation of the teams. Mr. Brown said that flare-up fighting often occurred, even in practice sessions of his teams.

■ It is wholly incongruous to talk about a professional football player's duty of care for the safety of opposing players when he has been trained and motivated to be heedless of injury to himself. The character of NFL competition negates any notion that the playing conduct can be circumscribed by any standard of reasonableness.

■ Both theories of liability are also subject to the recognized defenses of consent and assumption of the risk. Here the question is what would a professional football player in the plaintiff's circumstances reasonably expect to encounter in a professional contest?

All of the witnesses with playing or coaching experience in the NFL agreed that players are urged to avoid penalties. The emphasis, however, is on the unfavorable effects of the loss of yardage, not the safety of the players. It is undisputed that no game is without penalties and that players frequently lose control in surges of emotion.

The conflict in the testimony is the difference in the witnesses' opinions as to whether Mr. Clark's act of striking the plaintiff on the back of the head in reaction to anger and frustration can be considered as "a part of the game." Several former players denounced this incident and said that Mr. Clark's conduct could not be considered customary or acceptable.

It is noteworthy that while this incident was clearly shown on the Denver Broncos' defensive game films, which were routinely reviewed by the defensive players and coaching staff, none of them made it a matter of special attention or concern.

■ Upon all of the evidence, my finding is that the level of violence and the frequency of emotional outbursts in NFL football games are such that Dale Hackbart must have recognized and accepted the risk that he would be injured by such an act as that committed by the defendant Clark on September 16, 1973. Accordingly, the plaintiff must be held to have assumed the risk of such an occurrence. Therefore, even if the defendant breached a duty which he owed to the plaintiff, there can be no recovery because of assumption of the risk.

The plaintiff has also claimed that he is a beneficiary of a contract made for his protection. That is based on a provision of the standard player contract whereby the player agrees to conform to the rules and regulations of the NFL. Thus, it is argued that the rules of play include safety rules for the benefit of opposing players. That is a strained interpretation of the contractual provisions. In context, the rules and regulations referred to are those relating to the employment relationship and not the conduct of play. To hold otherwise would create a potential for contract liability for every infraction of every playing rule.

■ The plaintiff asserts that Mr. Clark was guilty of outrageous conduct. That doctrine is inapplicable to this case. Outrageous conduct has been the basis for liability where severe emotional distress resulted from some behavior which was considered to be so extraordinary and so far from societal norms as to be regarded as atrocious and utterly intolerable. Section 46, *Restatement of Torts*, 2d; *Rugg v. McCarty*, 173 Colo. 170, 476 P.2d 753 (1970). Dale Hackbart did not suffer such emotional distress and Charles Clark's action was not outside applicable norms of NFL football.

■ Finally, plaintiff seeks recovery on a theory of an interference with contract. That tort was defined in *Comtrol, Inc. v. Mountain States Telephone & Telegraph Co.*, 32 Colo.App. 384, 513 P.2d 1082 (1973) to include an intent to cause a breach of contract and some action which does induce a breach as necessary elements. Neither is shown in the evidence in this case. The

Denver Broncos fully performed the Hackbart contract and an intent to interfere with it was certainly not what caused the blow by Charles Clark.

█ Liability of the defendant Cincinnati Bengals, Inc. is based upon a contention that the Bengals failed to instruct and control their rookie fullback. The record, however, reflects that what he did is, unfortunately, an example of the excesses of violence which have become expectable as a result of the style of play in the NFL. The question of liability of the employer under the doctrine of *respondeat superior* is not presented because Charles Clark is not liable to the plaintiff.

### The Application of Tort Principles to Professional Football—A Question of Social Policy

The business of the law of torts is to fix the dividing line between those cases in which a man is liable for harm which he has done, and those in which he is not. Justice O. W. Holmes, *The Common Law* (1881).

While the foregoing findings of fact and conclusions of law are determinative of the claim made by Dale Hackbart against Charles Clark and his employer, this case raises the larger question of whether playing field action in the business of professional football should become a subject for the business of the courts.

To compensate the injured at the expense of the wrongdoer, the courts have been compelled to construct principles of social policy. Through the processes of trial and error the judicial branch of government has historically evolved the common law principles which necessarily affect behavior in many contexts. The potential threat of liability for damages can have a significant deterrent effect and private civil actions are an important mechanism for societal control of human conduct. In recent years the pace of technical progress has accelerated and human conflicts have intensified.

The resulting need to expand the body of governing law with greater rapidity and certainty than can be achieved through the litigation process has been met by legislation and administrative regulation. That is particularly true of industrial injuries. The coal mines became subject to the Federal Coal Mine Safety Act. The railroads have long been governed by the Federal Employers Liability Act and the Safety Appliance Act. The Occupational Health and Safety Act has broad application.

To this time professional football has been a self-regulated industry. The only protection which NFL contract players have beyond self-defense and real or threatened retaliation is that which is provided by the league rules and sanctions. It may well be true that what has been provided is inadequate and that these young athletes have been exploited and subjected to risks which should be unacceptable in our social order. In this respect, it is interesting to compare football with boxing. Because of the essential brutality of the contest, prize fighting has been held to be unlawful unless conducted under the sanction and authority of a governmental commission. *Antlers Athletic Association v. Hartung*, 85 Colo. 125, 129, 274 P. 831 (1929). See C.R.S. (1973) §§ 12–10–101 *et seq.**

Football has been presumed to be lawful and, indeed, professional football has received the implicit approval of government because these contests take place in arenas owned by local governments and the revenues are subject to taxation. Like coal mining and railroading, professional football is hazardous to the health and welfare of those who are employed as players.

What is the interest of the larger community in limiting the violence of professional football? That question concerns not only the protection of the participants, but also the effects of such violence on those who observe it. Can the courts answer this question? I think not. An ordinary citizen is entitled to protection according to the usages of the society in which he lives, and

---

* Professional boxing was apparently legalized, without regulation, by a repeal of the cited statute by Senate Bill No. 418, effective July 1, 1977.

in the context of common community standards there can be no question but that Mr. Clark's blow here would generate civil liability. It would involve a criminal sanction if the requisite intent were present. The difference here is that this blow was delivered on the field of play during the course of action in a regularly scheduled professional football game. The Illinois court was concerned with the safety of high school athletes in *Nabozny v. Barnhill, supra,* 31 Ill.App.3d at 215, 334 N.E.2d at 260 and said:

> This court believes that the law should not place unreasonable burdens on the free and vigorous participation in sports by our youth. However, we also believe that organized, athletic competition does not exist in a vacuum. Rather, some of the restraints of civilization must accompany every athlete onto the playing field. One of the educational benefits of organized athletic competition to our youth is the development of discipline and self control.

The difficulty with that view as applied to professional football is that to decide which restraints should be made applicable is a task for which the courts are not well suited. There is no discernible code of conduct for NFL players. The dictionary definition of a sportsman is one who abides by the rules of a contest and accepts victory or defeat graciously. *Webster's Third New International Dictionary,* p. 2206 (1971). That is not the prevalent attitude in professional football. There are no Athenian virtues in this form of athletics. The NFL has substituted the morality of the battlefield for that of the playing field, and the "restraints of civilization" have been left on the sidelines.

Mr. Justice Holmes' simple statement of the function of tort law and the evidentiary record now before me clearly reveal the density of the thicket in which the courts would become entangled if they undertook the task of allocation of fault in professional football games. The NFL rules of play are so legalistic in their statement and so difficult of application because of the speed and violence of the play that the differences between violations which could fairly be called deliberate, reckless or outrageous and those which are "fair play" would be so small and subjective as to be incapable of articulation. The question of causation would be extremely difficult in view of the frequency of forceful collisions. The volume of such litigation would be enormous and it is reasonable to expect that the court systems of the many states in which NFL games are played would develop differing and conflicting principles of law. It is highly unlikely that the NFL could continue to produce anything like the present games under such multiple systems of overview by judges and juries. If there is to be any governmental involvement in this industry, it is a matter which can be best considered by the legislative branch.

■ My conclusion that the civil courts cannot be expected to control the violence in professional football is limited by the facts of the case before me. I have considered only a claim for an injury resulting from a blow, without weaponry, delivered emotionally without a specific intent to injure, in the course of regular play in a league-approved game involving adult, contract players. Football as a commercial enterprise is something quite different from athletics as an extension of the academic experience and what I have said here may have no applicability in other areas of physical competition.

Upon the foregoing findings of fact and conclusions of law, it is

ORDERED that judgment shall enter for the defendants, with costs to be taxed.